FILED

March 10, 2017

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 7:15 AM



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**IN THE COURT OF WORKERS' COMPENSATION CLAIMS**
**AT MURFREESBORO**

| | | |
|---|---|---|
| TOREY ANDREWS, | ) | Docket No. 2016-05-0854 |
|      Employee, | ) | |
| v. | ) | State File No. 58300-2016 |
| YATES SERVICES, LLC, | ) | |
|      Employer, | ) | Judge Dale Tipps |
| And | ) | |
| TRAVELERS INDEM. CO. | ) | |
|      Insurance Carrier. | ) | |
| | ) | |

---

### EXPEDITED HEARING ORDER GRANTING BENEFITS

---

This matter came before the undersigned workers' compensation judge on February 28, 2017, on the Request for Expedited Hearing filed by Torey Andrews. The present focus of this case is whether Mr. Andrews is entitled to medical and temporary disability benefits for his alleged back injury. The central legal issue is whether Mr. Andrews is likely to establish at a hearing on the merits he suffered an injury arising primarily out of and in the course and scope of his employment. For the reasons set forth below, the Court holds Mr. Andrews is likely to meet this burden and is entitled to the requested medical and temporary disability benefits.

### History of Claim

Mr. Andrews began working as a Yates employee on the assembly line at Nissan in February 2015. Although he often experienced soreness from his work, he never had any serious back problems or injuries until July 21, 2016. On that day, Mr. Andrews was installing glass windows in car doors as they came down the line. He testified this work required twisting, bending, and stooping. As he worked, Mr. Andrews began having pain in his lower back. He initially thought it was just ordinary soreness, but the pain grew worse through the rest of his shift. He reported to his supervisor the next day that his symptoms had progressed to sharp pains. Yates provided Mr. Andrews a panel of physicians, from which he selected the onsite clinic, Premise Health.

1

Records from Premise show that Mr. Andrews reported the onset of severe back pain on July 21. Nurse Practitioner Robert Dickinson examined Mr. Andrews and diagnosed dorsalgia, which he felt was "likely work-related." He prescribed Advil and Tylenol and returned Mr. Andrews to work with bending and stooping restrictions. Mr. Andrews returned to Premise several times over the next few weeks with complaints of continuing, and sometimes worsening, symptoms. He usually saw Mr. Dickinson, but also treated once with Nurse Practitioner Candace Humes and once with Dr. Terri Walker, all of whom continued physical therapy and work restrictions.

Mr. Dickinson eventually ordered a lumbar MRI. The MRI report indicated normal findings at all levels except L5-S1, which showed a "left paracentral posterior disc herniation of the L5-S11 disc with signal changes suggesting an annular tear. The herniating disc abuts the thecal sac anteriorly in the left as well as the left S1 root sleeve which demonstrates minimal deformity." The report also noted that the disc "demonstrates partial dessication." At Mr. Andrew's next visit, Mr. Dickinson reviewed the MRI report and noted, "Degenerative/idiopathic changes noted on MRI suggestive that this is not a primarily work related event."

On September 8, Mr. Andrew saw Dr. Gilbert Woodall at Premise for the first time. Dr. Woodall reviewed the MRI report and examined Mr. Andrews before assessing, "Discogenic pain and S1 radiculopathy of insidious idiopathic onset – not primarily work related." He prescribed a steroid dosepak and continued Mr. Andrews' restrictions.

Yates filed a Notice of Denial of Mr. Andrews' claim on September 12. It gave the basis of denial as, "Claim is denied as ATP opined that condition was not primarily work-related."

A week after his claim was denied, Mr. Andrews began treating with Dr. James Johnson at Elite Sports Medicine and Orthopaedic Center. Dr. Johnson conducted a physical examination and reviewed the MRI before diagnosing a herniated disc and lumbosacral radiculitis. He noted, "Acute L5-S1 disc herniation clearly work related and not degenerative in this healthy 26 year old." He ordered a steroid dosepak and physical therapy.

Mr. Andrews returned to Dr. Johnson on November 2 and reported some improvement, but still had constant pain, as well as numbness and tingling in his leg. Dr. Johnson noted that a neurosurgical second opinion "agreed that this was not degenerative and was likely work related but also agreed that surgery was not indicated at this point." He ordered an intralaminar epidural steroid injection. Mr. Andrews returned after the injection, which he reported only gave him pain relief for one week. Dr. Johnson ordered a specifically targeted transforaminal steroid injection.

Dr. Michael Moran performed the second opinion evaluation referenced by Dr. Johnson. He felt Mr. Andrews' symptoms probably stemmed from L5-S1. However, because the disc protrusion did not severely compress the S1 nerve root, and because the radicular symptoms were minor, Dr. Moran did not feel surgery was necessary at that time. He did not address causation in his office note.

Both Dr. Johnson and Dr. Woodall gave deposition testimony. When asked about causation, Dr. Johnson testified that Mr. Andrews' disc herniation was acute and "100% causal from his work." He gave several reasons why he did not believe the MRI was consistent with degenerative disc disease. First, he stated that the likelihood of degenerative disc disease in a twenty-six-year-old is "slim to none." Second, only the L5-S1 level was affected – all the other levels were normal. Dr. Johnson noted that, if someone had early degenerative disc disease, it would affect multiple levels. In addition, he testified that the MRI showed signs of inflammation and an annular tear, which is indicative of an acute tear in the lining of the disc.

Dr. Woodall testified that the lack of degeneration at other levels was not significant, as the L5-S1 degenerative disc disease could be the result of a prior injury. He felt Mr. Andrews' back injury and complaints were not primarily work related, but were:

> Primarily due to an annular tear that was likely experienced many years before through some sort of fall or bicycle accident or sports injury that spent many years desiccating where it finally gave way. It happened to be at work when it did. So work can give its one, two, five percent contribution to it. But by and large, most of it is degenerative from a prior annular tear.

Mr. Andrews testified that Yates provided light-duty work for him until January 10, 2017, at which time he had to take medical leave because of his temporary medical restrictions. He seeks payment of temporary disability benefits beginning from that date. Mr. Andrews also requests reimbursement of $669.23 in out-of-pocket medical expenses for his health insurance co-payments, and payment of $2,774.55 in medical bills paid by his health insurance carrier, Blue Cross Blue Shield.

### Findings of Fact and Conclusions of Law

The following legal principles govern this case. To prove a compensable injury, Mr. Andrews must show that his alleged injury arose primarily out of and in the course and scope of his employment. Tenn. Code Ann. § 50-6-102(14) (2016). To do so, he must show his injury was primarily caused by an incident, or specific set of incidents, identifiable by time and place of occurrence. *Id*. at § 50-6-102(14)(A). Further, he must show, "to a reasonable degree of medical certainty that it contributed more than fifty

3

percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." *Id*. at § 50-6-102(14)(C). "Shown to a reasonable degree of medical certainty" means that, in the opinion of the treating physician, it is more likely than not considering all causes as opposed to speculation or possibility. *Id*. at § 50-6-102(14)(D).

However, because this case is in a posture of an Expedited Hearing, Mr. Andrews need not prove every element of his claim by a preponderance of the evidence in order to obtain relief. *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015). Instead, he must come forward with sufficient evidence from which this Court might determine he is likely to prevail at a hearing on the merits. *Id*.; Tenn. Code Ann. § 50-6-239(d)(1).

*Causation*

The Court first notes that Yates presented no testimony or other proof regarding Mr. Andrews' description of the events of July 21, 2016. It did, however, question Mr. Andrews' description of his symptoms. Specifically, Yates contended that Mr. Andrews stated during a recorded statement that there was no qualitative difference between the pain that began on July 21 and his normal aches and pains. This argument is not persuasive. A careful reading of the transcript of Mr. Andrews' statement shows that his description of "just soreness" was in response to a question about his complaints prior to the work injury, not his symptoms afterward. This is consistent with the rest of Mr. Andrews' recorded statement and his testimony at the hearing.

Thus, there is no dispute that Mr. Andrews established a specific incident, identifiable by time and place. The question to be resolved, therefore, is whether he appears likely to prove at a hearing on the merits that the incident is the primary cause of his current symptoms and need for medical treatment. Applying the foregoing principles to the facts of this case, the Court finds that Mr. Andrews is likely to meet this burden.

The parties presented two conflicting causation opinions. Yates contends Dr. Woodall's opinion is entitled to particular consideration because Mr. Andrews selected him from a panel. Tennessee Code Annotated section 50-6-102(14)(E) establishes a rebuttable presumption of correctness for a causation opinion given by an authorized panel physician. It is not entirely clear whether Dr. Woodall's opinion is entitled to the presumption under section 50-6-102(14)(E), since Mr. Andrews did not select Dr. Woodall from the panel, but rather selected a "specialty practice group" and, in fact, saw more than one doctor in that practice.[1] *See* Tennessee Code Annotated section 50-6-204(a)(3)(A)(i). However, even if Dr. Woodall's opinion were presumed to be correct, the Court finds the preponderance of the medical proof is sufficient to overcome that

---

[1] For example, Dr. Walker noted on August 5 that Mr. Andrews' condition was "likely primarily work related." Since she practiced in Premise Health with Dr. Woodall, it could be argued that both of their causation opinions were entitled to the presumption, even though the opinions conflicted with each other.

presumption.

Both Dr. Woodall and Dr. Johnson were very certain of their causation analysis and both were somewhat dismissive of the other's methodology and conclusions. In resolving this clash of opinions, the Court notes longstanding Tennessee case law that provides:

> When the medical testimony differs, the trial judge must obviously choose which view to believe. In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

*Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).

Applying the first of these factors, the Court notes that both physicians are board-certified – Dr. Woodall in occupational medicine and Dr. Johnson in family practice and in sports medicine. Neither is board-certified in orthopedics or neurology. A review of their respective curriculum vitae shows that each doctor has significant experience upon which to draw in their evaluation of Mr. Andrews' condition. The Court finds that both doctors are well qualified and the differences in their qualifications are not determinative.

The next two factors would normally tend to weigh in favor or Dr. Johnson. He treated Mr. Andrews on several occasions and reviewed the actual MRI films, whereas Dr. Woodall only saw Mr. Andrews for one visit and had only the MRI report. However, there is no evidence that these factors lend any additional credence to Dr. Johnson's opinion, since there is no material difference in the two doctors' physical findings. That is, both doctors agree with the accuracy of the MRI report, but they disagree on how to interpret those findings.

Dr. Johnson testified repetitive bending is a known mechanism for disc herniation, especially if it involves any sort of lifting. He concluded that, because of the nature of Mr. Andrews' onset of symptoms, his reported July 21 work injury was the primary cause of the disc herniation. Dr. Johnson further explained that the disc desiccation shown in the MRI could be acute, rather than degenerative. This would explain why the other levels showed no degenerative disc disease.

Dr. Woodall, on the other hand, felt that the lack of degeneration at other levels was not significant, as the L5-S1 degenerative disc disease could be the result of a prior injury. He testified that Mr. Andrews' complaints were primarily due to a preexisting annular tear that desiccated over time, which makes it a degenerative condition. In support of his opinion, Dr. Woodall cited a portion of the AMA Guides to the Evaluation of Disease and Injury Causation that says in part, "there is insufficient scientific evidence

5

to attribute the cause of lumbar disc herniation to any minor trauma event or ergonomic risk factor." He testified that, had Mr. Andrews fallen down the stairs, the herniation would have been work-related in spite of the preexisting disease, but he believes Mr. Andrews' activities on July 21 were "a very small contribution" to the overall condition.

After careful consideration, the Court finds Dr. Woodall's testimony unpersuasive. Although the Court is not statutorily bound to follow the AMA Guides to the Evaluation of Disease and Injury Causation, Dr. Woodall's reliance on the relevant portion of the Guides is worth examining. A single page of the Guides containing the quote he cited is an exhibit to his deposition. While Dr. Woodall's citation was accurate, it is notable that the excerpt does not define "ergonomic risk factor." It is not clear whether this phrase includes repetitive bending and lifting, which Dr. Johnson testified is a known mechanism for disc herniation. Further, to the extent the Causation Guides' pronouncement could be interpreted to mean there is insufficient scientific evidence to attribute lumbar disc herniation to Mr. Andrews' work, Dr. Woodall's own testimony is somewhat at odds with that interpretation. He stated more than once that the disc became fragile or desiccated over many years and then "finally gave way" and herniated during Mr. Andrews' work.

Based on this testimony from Dr. Woodall, it is unnecessary to determine whether Mr. Andrews' disc desiccation or degeneration was acute or chronic, because both doctors agree that Mr. Andrews suffered a disc herniation that occurred while he was working on July 21, 2016. He therefore appears likely to prove that his injury occurred in the course of his employment. *See Johnson v. Wal-Mart Associates, Inc.*, 2015 TN Wrk. Comp. App. Bd. LEXIS 18, at *11-12 (July 2, 2015).

This leaves the question of whether Mr. Andrews is likely to prove his disc herniation arose primarily out of his work. The Court notes that, not only did the doctors agree the herniation occurred at work, but Dr. Woodall also conceded that Mr. Andrews' work activities on July 21 constituted at least a "small contribution" to his overall condition. Thus, while the doctors differed as to the degree of work contribution, they agreed that Mr. Andrews' work at least partially caused his disc herniation. Although Dr. Woodall felt the work contributed only minimally, his agreement that Mr. Andrews' work contributed to the injury supports Dr. Johnson's testimony that repetitive bending and lifting is a known mechanism for disc herniation and that the July 21 work injury was the primary cause of the disc herniation. Mr. Andrews thus appears likely to prove at a hearing on the merits that his injury arose primarily out of his employment.

*Medical Benefits*

Mr. Andrews requests reimbursement of $669.23 in out-of-pocket medical expenses for his health insurance co-payments, and payment of $2,774.55 in medical bills previously paid by his health insurance carrier, Blue Cross Blue Shield. During the

6

hearing, Yates stipulated both amounts and stipulated that they represented reasonable and necessary medical treatment. Yates must therefore reimburse Mr. Andrews for his out-of-pocket expenses. However, Mr. Andrews did not submit any actual medical bills into evidence. Thus, even with the stipulation, in the absence of any information as to the medical providers or the specific amounts owed to each, the Court cannot order payment of the bills at this time.

Although initially provided with a panel of physicians, Mr. Andrews reasonably sought treatment with his own doctor after Yates denied his claim. Further, he has treated for some time with Dr. Johnson and continues to do so. Therefore, the Court concludes it is appropriate to designate Dr. Johnson as Mr. Andrews' authorized treating physician for future treatment.

*Temporary Disability Benefits*

Mr. Andrews also seeks payment of temporary partial disability benefits. "Temporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Jones v. Crencor Leasing and Sales*, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Dec. 11, 2015). Thus, in circumstances where the treating physician has released the injured worker to return to work with restrictions prior to maximum medical improvement, and the employer either (1) cannot return the employee to work within the restrictions or (2) cannot provide restricted work for a sufficient number of hours and/or at a rate of pay equal to or greater than the employee's average weekly wage on the date of injury, the injured worker may be eligible for temporary partial disability. *Id.*

Dr. Johnson testified that he placed Mr. Andrews on temporary lifting and bending restrictions when he first saw him on September 20 and that those restrictions are still in place. Mr. Andrews testified that, beginning on January 10, 2017, Yates failed to accommodate his restrictions by providing a light-duty job. He is therefore entitled to unpaid temporary partial disability benefits for the period of January 10 through the date of this order. At the stipulated compensation rate of $449.89, this constitutes eight weeks and four days of benefits, or $3,856.20.

**IT IS, THEREFORE, ORDERED** as follows:

1. Yates shall provide Mr. Andrews with medical treatment made reasonably necessary by the July 21, 2016 injury and in accordance with Tennessee Code Annotated section 50-6-204. Dr. Johnson shall be designated the authorized treating physician.

2. Yates shall reimburse Mr. Andrews for his out-of-pocket medical expenses in the amount of $669.23.

7

3. Yates shall pay Mr. Andrews temporary partial disability benefits in the amount of $3,856.20 for the period from January 10, 2017, through March 10, 2017.

4. Yates or its workers' compensation carrier shall continue to pay Mr. Andrews temporary disability benefits in regular intervals until he becomes ineligible for those benefits by reaching maximum medical improvement, by returning to work at a wage equal to or greater than the pre-injury wage, or by release without restrictions by the authorized treating physician. Yates' representative shall immediately notify the Bureau, Mr. Andrews, and Mr. Andrews' counsel of the intent to terminate temporary disability benefits by filing Form C-26, citing the basis for the termination.

5. This matter is set for a Scheduling Hearing on May 4, 2017, at 9:00 a.m. You must call 615-741-2112 or toll free at 855-874-0473 to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).

6. **Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

7. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 10th day of March, 2017.**

_____
**Judge Dale Tipps**
**Court of Workers' Compensation Claims**

8

**APPENDIX**

Exhibits:
1. Affidavit of Torey Andrews
2. Indexed medical records
3. Transcript of Dr. Woodall's deposition
4. Transcript of Dr. Johnson's deposition
5. First Report of Injury
6. Wage Statement
7. Choice of Physician form
8. Notice of Denial
9. Employee/Manager Medical Statement
10. Transcript of Torey Andrews' recorded statement

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Expedited Hearing Order Granting Benefits was sent to the following recipients by the following methods of service on this the 10th day of March, 2017.

| Name | Certified Mail | Via Fax | Via Email | Email Address |
|------|----------------|---------|-----------|---------------|
| **Samuel Garner** | | | **x** | samgarner@fowlkesgarner.com |
| **John R. Rucker, Jr.** | | | **x** | jrucker@ruckerlaw.com |

_____

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**